**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

IN THE MATTER OF COOPER
MARINE & TIMBERLANDS CORPORATION,
as Owner *Pro Hac Vice* and Operator;
GATX THIRD AIRCRAFT, LLC,
as Owner of Barge CMT 123,
Official No. 1067600

No. 3:15CV00170 JLH (Lead)

---

KASSANDRA NIEVES, Individually                                            PLAINTIFF
and as Personal Representative
of the Estate of Juan Nieves, and
His Surviving Heirs and Dependents


v.                                      No. 3:15CV00350 JLH

COOPER MARINE & TIMBERLANDS CORPORATION;
LOGISTIC SERVICES, INC.; STEEL DYNAMICS
COLUMBUS, LLC; KINDER MORGAN BULK
TERMINALS, INC.; KINDER MORGAN MARINE
SERVICES, LLC; and KINDER MORGAN ENERGY
PARTNERS, L.P.                                                        DEFENDANTS

AND

COOPER MARINE & TIMBERLANDS                      THIRD-PARTY PLAINTIFFS
CORPORATION; LOGISTIC SERVICES, INC.;
and STEEL DYNAMICS COLUMBUS, LLC

v.

DAWSON EMPLOYMENT SERVICE, INC.;
and TEMPS PLUS, INC.                            THIRD-PARTY DEFENDANTS

---

ROBERT L. COLEMAN, Special Administrator                               PLAINTIFFS
for the Estate of Nicolas Perez Hernandez, and
His Surviving Heirs and Dependents

v.                                      No. 3:15CV00225 JLH

COOPER MARINE & TIMBERLANDS CORPORATION;
LOGISTIC SERVICES, INC.; STEEL DYNAMICS
COLUMBUS, LLC; KINDER MORGAN BULK
TERMINALS, INC.; KINDER MORGAN MARINE
SERVICES, LLC; and KINDER MORGAN ENERGY
PARTNERS, L.P.                                                                          DEFENDANTS

AND

COOPER MARINE & TIMBERLANDS
CORPORATION; LOGISTIC SERVICES, INC.;
and STEEL DYNAMICS COLUMBUS, LLC                        THIRD-PARTY PLAINTIFFS

v.

DAWSON EMPLOYMENT SERVICE, INC.;
and TEMPS PLUS, INC.                                                     THIRD-PARTY DEFENDANTS

## OPINION AND ORDER

Juan Nieves and Nicolas Perez Hernandez were killed while working on a barge on the
Mississippi River near Blytheville, Arkansas.  Cooper Marine & Timberlands Corporation and
GATX Third Aircraft, LLC, initially brought an action for exoneration from or limitation of liability
pursuant to 46 U.S.C. § 30511.  Representatives of the decedents then commenced separate actions
against Cooper Marine, Logistic Services, Inc., and Steel Dynamics Columbus, LLC.  Through
discovery, the representatives in both actions determined that Kinder Morgan Bulk Terminals, Inc.,
Kinder Morgan Energy Partners, L.P., and Kinder Morgan Marine Services, LLC, could be liable
and amended their respective complaints to include these entities as defendants.  Cooper Marine,
Logistic Services, and Steel Dynamics then made crossclaims against  Kinder Morgan Bulk
Terminals, Kinder Morgan Energy Partners, and Kinder Morgan Marine Services.  Additionally,
Cooper Marine, Logistic Services, and Steel Dynamics, as third-party plaintiffs, sued Temps Plus,
Inc., and Dawson Employment Service, Inc., alleging that these nonparties may be liable to them

for all or part of the claims against them. *See* Fed. R. Civ. P. 14(a)(1). Because the actions involve common questions of law and fact, the Court granted the parties' joint motion to consolidate the three actions for discovery purposes only.[1] *See* Fed. R. Civ. P. 42(a).

Kinder Morgan Bulk Terminals and Kinder Morgan Energy Partners have moved for summary judgment, arguing that (1) Kinder Morgan Bulk Terminals is immune from liability under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, and (2) Kinder Morgan Energy Partners played no role in the deaths of decedents. Cooper Marine, Logistic Services, and Steel Dynamics oppose the motion. For the following reasons, the motions for summary judgment are denied. Document #98 (225), Document #84 (350).

## I.

On March 8, 2014, pursuant to a contract with Steel Dynamics, Logistic Services loaded steel coils on a BIG 420 and CMT 123B barge for shipment from its Columbus, Mississippi facility to the Kinder Morgan Bulk Terminals unloading facility near Blytheville, Arkansas. Document #66 at 4-5 (225). The CMT 123B barge was loaded with a total of 46 coils, each of which weighed more than thirty tons. Document #105-1 at 4 (225). Steel Dynamics manufactured the coils and provided the wooden saddles onto which the coils were loaded and secured. Document #105-2 at 4 (225). A Cooper Marine tug took custody of the barges and delivered them to a Kinder Morgan Marine Services fleet terminal in Arkansas. Document #66 at 5 (225). Kinder Morgan Marine Services then towed the barges to the Kinder Morgan Bulk Terminals coil dock. *Id.* The BIG 420 barge was unloaded first without incident. Document #105-4 at 6 (225). During the unloading of the CMT

---

[1] When citing to the record, the Court will indicate in parentheses the last three digits of the case from which the document originated.

3

123B barge, however, the barge suddenly rolled to the inshore side and sank.  Document #66 at 5 (225).  Nieves and Perez Hernandez were on the CMT 123 barge when it sank and were both killed. *Id.*

Both workers were temporary employees provided to Kinder Morgan Energy Partners by staffing agencies.  Nieves was employed through Temps Plus, while Perez Hernandez was employed through Dawson.  Document #105-5 at 16 (225); Document #105-6 at 14 (225).  Temps Plus and Dawson each had similar contracts with Kinder Morgan Energy Partners, in which each acted as an independent contractor supplying the labor requested by Kinder Morgan Energy Partners. Document #105-7 (225); Document #105-8 (225).  Both decedents had initially been placed with Kinder Morgan Energy Partners as torch cutters.  Kinder Morgan Energy Partners requested Temps Plus to send it a cutting torch operator, and on June 14, 2010, Temps Plus assigned Nieves to work as a cutting torch operator for Kinder Morgan Energy Partners.  Document #105-5 at 5 (225). Likewise, Kinder Morgan Energy Partners requested Dawson to send it a cutting torch operator, and on May 21, 2012, Dawson assigned Perez Hernandez to work as a cutting torch operator for Kinder Morgan Energy Partners.  Document #105-6 at 9-10 (225).  On the day of the accident, however, Nieves and Perez Hernandez were not working as cutting torch operators but were on a barge unloading steel coils.  Document #66 at 5 (225).

The staffing contracts between Kinder Morgan Energy Partners and Temps Plus and Dawson explicitly provided that nothing in the agreement was intended to create an employer-employee relationship between Kinder Morgan Energy Partners and employees of Temps Plus and Dawson. Document #105-7 at 4, ¶ 4.1 (225); Document #105-8 at 3, ¶ 4.1 (225).  The contracts required Temps Plus and Dawson to furnish and pay for the workers' salary, compensation, benefits, and

4

training and supplies.  Document #105-7 at 3-4, ¶¶ 3.4, 4.5 (225); Document #105-8 at 3-4, ¶¶ 3.4, 4.5 (225); Document #107 at ¶ 4 (225).  Under the contracts, Temps Plus and Dawson were also responsible for handling disciplinary actions, training, job evaluations, and other supervisory tasks. Document #105-7 at 10, ¶ 1.2 (225); Document #105-8 at 9, ¶ 1.2 (225).  Additionally, Temps Plus and Dawson remained liable for all damages caused by the performance of their employees. Document #105-7 at 10, ¶ 1.6 (225); Document #105-8 at 9, ¶ 1.6 (225).  The contracts also required Temps Plus and Dawson to carry insurance, such as employer's liability insurance and workers' compensation insurance compliant with the Longshore Act.  Document #105-7 at 6, ¶ 9.1 (225); Document #105-8 at 5, ¶ 9.1 (225).

Kinder Morgan Energy Partners was required to provide Temps Plus and Dawson with labor classifications, which could only be revised by mutual agreement.  Document #105-7 at 2, ¶ 3.1 (225); Document #105-8 at 2, ¶ 3.1 (225).  The labor classifications, in turn, determined the labor markup rate Temps Plus and Dawson charged Kinder Morgan Energy Partners for their services. Document #108-1 at 30-31.  For assignments that required coverage under the Longshore Act, Temps Plus charged Kinder Morgan Energy Partners a 44% markup rate, but it charged a 38% rate for employees not needing such coverage.  Document #105-5 at 8 (225).  Dawson charged Kinder Morgan Energy Partners a rate of 45% and 40% respectively.  Document #108-1 at 30 (225).  The cutting-torch-operator assignment did not require coverage under the Longshore Act.  Document #105-5 at 14 (225); Document #108-1 at 31 (225). At the time of the accident, Temps Plus was charging Kinder Morgan Energy Partners a 38% rate for Nieves's employment, and Dawson was

charging Kinder Morgan Energy Partners a 45% rate for Perez Hernandez's employment.[2] Document #105-5 at 11 (225); Document #108-1 at 31 (225).  Neither Temps Plus nor Dawson received communication from Kinder Morgan Energy Partners of the changes in position of Nieves and Perez Hernandez.  Document #105-5 at 10-11 (225); Document #105-6 at 12 (225).  After the accident, Temps Plus and Dawson each filed a report with the U.S. Department of Labor, noting the positions of Nieves and Perez Hernandez as torch cutters "at the time of the incident."  Document #98-1 at 95 (350); Document #108-1 at 87 (225).

## II.

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A genuine dispute of material fact exists only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

---

[2] Dawson produced a record reflecting that Perez Hernandez moved from "Dawson's" payroll to "Dawson LLC's" payroll and had his Workers' Compensation code altered to "7350F." As Linda Moore explained, those changes signified a change from a land-based job assignment to a river-based job assignment. *See* Document #105-6 at 9-12 (225). Moore also testified that the payroll document may have been created after the accident and Dawson does not have any record reflecting Perez Hernandez's change in position prior to the accident. *Id.* at 12.

2505, 2510, 91 L. Ed. 2d 202 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record.  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).  If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law.  *Id.*

### III.

Kinder Morgan Bulk Terminals argues that it is a borrowing employer of Nieves and Perez Hernandez and entitled to tort immunity under the Longshore Act.  *See* 33 U.S.C. § 905(a).  Kinder Morgan Energy Partners argues that because it was not involved in unloading the barges, it played no role in the deaths of Nieves and Perez Hernandez.

Under the Longshore and Harbor Workers' Compensation Act, an employer's liability in the case of an employee's injury or death is limited to the liability prescribed under section 904 of the Act.  *Id.*  In other words, the Act makes an employer immune from tort liability.  Courts have extended this immunity to employers who "borrow" an employee from the employee's general employer.  *See, e.g., White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000).

In *Standard Oil v. Anderson*, 212 U.S. 215, 29 S. Ct. 252, 53 L. Ed. 480 (1909), the Supreme Court first recognized the "borrowed-servant" doctrine in the context of *respondeat superior* liability.  The Court explained that "[o]ne may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation."  *Id.* at 220, 29 S. Ct. at 253.  Beginning with *Ruiz v.*

*Shell Oil Co.*, 413 F.2d 310 (5th Cir.1969), courts applied this doctrine to the Longshore Act to shield borrowing employers from tort liability to their borrowed servants. *See Gaudet v. Exxon Corp.*, 562 F.2d 351, 355-56 (5th Cir. 1977).

Within the Federal Courts of Appeals, two tests have emerged for determining whether an employee is a "borrowed servant." The Third and Eleventh Circuits have followed the Fifth Circuit in using a nine-factor test. *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1125-26 (11th Cir. 2011) (citing *Ruiz*, 413 F.2d at 310, but stepping back from *Ruiz*'s sole reliance on the common law's control test and requiring that a borrowed servant consent either impliedly or expressly); *Vanterpool v. Hess Oil V.I. Corp.*, 766 F.2d 117, 122 (3rd Cir. 1985) (citing *Ruiz*, 413 F.2d at 310, and placing heavy emphasis on (1) whether the borrowing employer was responsible for the borrowing employee's working conditions and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his new employment). Conversely, the Fourth Circuit simply asks "whether the borrowing employer has authoritative direction and control over a worker." *Bethlehem Steel*, 222 F.3d at 149-50 (rejecting the Fifth Circuit's nine-factor test); *but see Am. Stevedoring Ltd. v. Marinelli*, 248 F.3d 54, 64 (2d Cir. 2001) (equating the Fifth and Fourth Circuit tests). Under either test, there are disputed questions of material fact regarding the status of Kinder Morgan Bulk Terminals' relationship with Nieves and Perez Hernandez.

In determining whether an employee is a "borrowed servant," the Fifth Circuit's test directs courts to consider the following factors:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> (2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
(4) Did the employee acquiesce in the new work situation?
(5) Did the original employer terminate his relationship with the employee?
(6) Who furnished tools and place for performance?
(7) Was the new employment over a considerable length of time?
(8) Who has the right to discharge the employee?
(9) Who had the obligation to pay the employee?

*Gaudet*, 562 F.2d at 355 (citing *Ruiz*, 413 F.2d at 312-13).  No one factor is considered dispositive. *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245, 247 (5th Cir. 1981).  While it is true that whether a borrowed-servant relationship exists is a matter of law for the court to determine, the above-listed factors are factual inquiries that underlie the legal determination.  *Melancon v. Amoco Prod.*, 834 F.2d 1238, 1244 (5th Cir.), *amended on reh'g in part sub nom. Melancon v. Amoco Prods. Co.*, 841 F.2d 572 (5th Cir. 1988).

Kinder Morgan Bulk Terminals argues that each factor supports finding in favor of a borrowed-servant relationship.  According to Kinder Morgan Bulk Terminals, weighing the factors so is supported by the following: it had complete control and supervision over the employees' day-to-day and onsite work; it was able to terminate its relationship with Nieves and Perez Hernandez at any time; it supplied Nieves and Perez Hernandez with tools and a place for performance of the work; Nieves and Perez Hernandez worked for Kinder Morgan Bulk Terminals exclusively for years and not just for a brief period; and Kinder Morgan Bulk Terminals, though not paying Nieves and Perez Hernandez directly, payed Temps Plus and Dawson for the labor of Nieves and Perez Hernandez.

Kinder Morgan Bulk Terminals relies heavily on *Melancon*, 834 F.2d at 1238, in weighing these factors.  In *Melancon*, a welder, who was on the payroll of a machine shop, was injured while working on an offshore platform owned and operated by Amoco.  *Id.* at 1241.  The welder had

worked on Amoco's platform for five years leading up to the injury. *Id.* The welder was transported to and from the platforms by Amoco along with the Amoco crew, and the welder stayed in the same bunkhouse and ate the same food as the Amoco crew. *Id.* Amoco payed the machine shop an hourly rate for the welder's services, and the machine shop payed the welder a portion of that hourly rate. *Id.* The welder would report his hours to the machine shop once every two weeks but otherwise had no contact with the machine shop. *Id.* Although Amoco could not terminate the welder's employment with the machine shop, it could request that the welder be replaced. *Id.* at 1242. Amoco was free to assign the welder nonwelding work when there was no welding work to be done. *Id.* Amoco and the machine shop had a "Well and Lease Service Master Contract" essentially stating that no employee of the machine shop was to be deemed an employee of Amoco for any purpose. *Id.* The contract also required the machine shop to maintain various types of insurance, including workers' compensation, during the term of the contract. *Id.*

After hearing the evidence at a bench trial, the district court considered all nine *Ruiz* factors and found that the evidence clearly indicated a borrowed-servant status on all but one. *Id.* at 1244. The Fifth Circuit reviewed the district court's factual findings under each *Ruiz* factor for clear error and held that it correctly determined the welder was a borrowed servant. Unlike the district court in *Melancon*, this Court is reviewing the evidence on summary judgment and must draw all reasonable inferences in favor of the nonmoving parties.

In considering the first *Ruiz* factor—who has control over the employee and the work performed—Kinder Morgan Bulk Terminals directed and supervised the workers in their day-to-day tasks, but it did not necessarily have control over other aspects of the employment of Nieves and Perez Hernandez. For example, Temps Plus and Dawson each maintained an absenteeism policy,

10

forbidding unexcused absences, as well as a random drug testing policy.  *See* Document #98-1 at 32 (350); Document #105-5 at 22 (225); Document #108-1 at 17 (225).  Moreover, under the contracts, Temps Plus and Dawson were responsible for handling disciplinary actions, training, job evaluations, and other supervisory tasks.  Document #105-7 at 10, ¶ 1.2 (225); Document #105-8 at 9, ¶ 1.2 (225).  Temps Plus confirmed that it provided its employees intermittent training to ensure continued performance under the contract with Kinder Morgan Energy Partners.  Document #98-1 at 32-33 (350).  Dawson, on the other hand, stated that it was not responsible for training but could point to no written agreement or amendment to the contract.   Document #108-1 at 8-12.  Additionally, Temps Plus and Dawson remained liable for all damages caused by the performance of its employees.  Document #105-7 at 10, ¶ 1.6 (225); Document #105-8 at 9, ¶ 1.6 (225).  At this stage, the written and signed agreement of Kinder Morgan is strong evidence of the nature and extent of its control over Nieves and Perez Hernandez.  It may turn out that the parties did not honor their agreement, and Kinder Morgan Bulk Terminals argues that the evidence shows that the contracts were modified.  However, the contracts contain a merger clause requiring a written amendment signed by each party.  *See* Document 98-3 at 33, ¶ 25.0 (225). Viewed in the light most favorable to the nonmoving parties, the evidence on this factor does not unequivocally support Kinder Morgan Bulk Terminals' argument.

As to the second factor, Nieves and Perez Hernandez were performing work for Kinder Morgan Bulk Terminals.  The third factor is whether there was an agreement or meeting of the minds between the original and borrowing employer.  The contracts here memorialize the agreement Kinder Morgan Energy Partners made with Temps Plus and Dawson regarding the employment status of temporary workers.  Both contracts contained an exhibit that temporary workers were

11

required to sign, stating, in relevant part, "I understand and acknowledge that I am a temporary worker . . . for purposes of all federal, state and local labor laws.  I understand that I am not an employee of Kinder Morgan Inc. or any of its subsidiaries."  Document #98-3 at 46 (225).  Kinder Morgan Bulk Terminals argues that this factor weighs in its favor because Nieves and Perez Hernandez worked exclusively at its site for a long period of time, but that reasoning collapses three separate factors into one.  Whose work is being performed and the length of the employment are independent factors.  Kinder Morgan Bulk Terminals also argues that this case is similar to the situation in *Melancon*, where, although there was a similar independent-contractor provision, the district court found that the reality at the worksite and the parties' actions impliedly modified, altered, or waived an express contract provision.  Kinder Morgan Bulk Terminals fails to acknowledge, however, that the finding in *Melancon* was made after a trial and not on summary judgment.  Just as importantly, the contracts at issue here have a merger clause, but *Melancon* made no mention of a similar provision.

At this point, it should be noted that the Fifth Circuit has deemphasized these first few factors in borrowed-servant cases where the Longshore Act is being used as a defense to common-law liability, as it is here.  *See Gaudet*, 562 F.2d at 357.  The Fifth Circuit has instead stressed the importance of the fourth, fifth, sixth, and seventh factors under *Ruiz*: "The principal focus within the Ruiz test in this case should therefore be: (1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein, and (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto?"  *Id.*  In the *respondeat superior* context, out of which the borrowed-servant doctrine grew, it is proper to

emphasize control and focus on the borrowing employer because liability is imputed based on whether the employee acted under the orders of his employer. *See id*. at 356. In the Longshore Act context, however, the borrowed-servant doctrine is not a means of imputing liability but escaping it. *Id.* An employee should not be held to waive his right to sue third parties unless it can be shown that the employee understood the trade-off that the Longshore Act imposes. *Id.* at 357.

Accordingly, the focus of the fourth factor is "whether the employee was aware of his work conditions and chose to continue working in them." *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 678 (5th Cir. 1993). Kinder Morgan Bulk Terminals argues that Nieves and Perez Hernandez acquiesced to their work situations by working for Kinder Morgan Bulk Terminals for a long period of time. While it is true that both worked for Kinder Morgan Bulk Terminals for an extended period of time, from which a court might normally be able to infer acquiescence, the record as it currently stands does not support that inference here. First, as already mentioned, Nieves and Perez Hernandez were required to sign "Exhibit D" to the contracts, which in relevant part stated, "I understand and acknowledge that I am a temporary worker . . . for purposes of all federal, state and local labor laws. I understand that I am not an employee of Kinder Morgan Inc. or any of its subsidiaries." Document #98-3 at 46 (225). Second, Nieves and Perez Hernandez were originally hired as torch cutting operators. These positions are not covered under the workers' compensation provision of the Longshore Act. It is unknown when Kinder Morgan Bulk Terminals changed their assignments to stevedores, positions that are covered under the Longshore Act. Without knowing how long both men worked as stevedores, the Court is unable to infer acquiescence.

The fifth factor—whether the original employer terminated his relationship with the employee—does not require a lending employer to cut all ties with the employee. *Melancon*, 834

F.2d at 1246.  For the same reasons discussed under the first factor, the evidence does not conclusively point one way on this factor.  The next factor is who furnished tools and the place for performance.  Undoubtedly, the work was performed onsite at Kinder Morgan Bulk Terminals, and Kinder Morgan Bulk Terminals provided Nieves and Perez Hernandez with coveralls, a hard hat, gloves, safety glasses, and a life vest.  Nevertheless, the contracts required Temps Plus and Dawson to supply all other tools necessary for the job.  As has already been mentioned, Temps Plus and Dawson supplied safety training and random drug testing.

The seventh factor considers the length of employment.  Had Nieves and Perez Hernandez worked for Kinder Morgan Bulk Terminals as stevedores the entire duration of their employment, this factor would weigh in favor of finding a borrowed-servant relationship.  But as discussed above, the duration of their employment as stevedores is unknown, and so the evidence does not support such a finding.

Finally, Kinder Morgan Bulk Terminals could request temporary workers be replaced and "furnished the funds from which" Temps Plus and Dawson paid Nieves and Perez Hernandez, which *Melancon* held were both sufficient to satisfy the eighth and ninth factors.  *See id.*

In short, some factors support the finding of a borrowed-servant relationship while others do not.  Viewing the evidence in the light most favorable to the nonmoving parties and giving them the benefit of all reasonable inferences, the Court is unable to hold that the evidence indisputably establishes that Kinder Morgan Bulk Terminals was a borrowing employer under the Fifth Circuit test.

14

Kinder Morgan Bulk Terminals also argues that it is a borrowing employer under the Fourth Circuit's test because it exercised exclusive supervision and control over the work of Nieves and Perez Hernandez.  For the reasons explained under the first *Ruiz* factor, the Court disagrees.

Last, Kinder Morgan Energy Partners argues that it should be granted summary judgment in its favor because it played no role in unloading the barges.  It contends that its only connection to the accident is the contracts between itself and Temps Plus and Dawson, and it argues that there is no evidence to support the allegations of negligent hiring and training.  Cooper Marine, Logistic Services, and Steel Dynamics argue that Kinder Morgan Energy Partners negligently hired or retained Nieves and Perez Hernandez because: (1) Nieves and Perez Hernandez were incompetent or unfit to perform the work of stevedores; (2) Kinder Morgan Energy Partners knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of their deaths.  *See Doe v. NCL (Bahamas) Ltd.*, No. 1:16-cv-23733-44, 2016 WL 6330587 at *3 (S.D. Fla. Oct. 27, 2016).

Kinder Morgan Energy Partners requested Temps Plus and Dawson to send it cutting torch operators.  Nieves and Hernandez filled those assignments.  The contracts between Kinder Morgan Energy Partners and Temps Plus and Dawson required specific labor classifications that could only be revised by mutual agreement.  Document #105-7 at 2, ¶ 3.1 (225); Document #105-8 at 2, ¶ 3.1 (225).  Kinder Morgan Energy Partners has presented no evidence establishing that Nieves and Perez Hernandez were trained or qualified to work as stevedores.  It is reasonable to infer from the workers' original classification and position as cutting torch operators that Kinder Morgan Energy Partners should have known they were not trained to work as stevedores.  Finally, questions of

causation remain undetermined at this point.  Kinder Morgan Energy Partners is not entitled to summary judgment at this point.

## CONCLUSION

Kinder Morgan Energy Partners and Kinder Morgan Bulk Terminals' motions for summary judgment are DENIED.  Document #98 (225), Document #84 (350).

IT IS SO ORDERED this 14th day of December, 2016.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE